584 S.E.2d 419

**The STATE, Respondent,**

**v.**

**Uuno Mattias BAUM, Appellant.**

**No. 3653.**

Court of Appeals of South Carolina.

Submitted April 7, 2003.

Decided June 16, 2003.

Rehearing Denied Aug. 22, 2003.

Deputy Chief Attorney of S.C. Office of Appellate Defense Joseph L. Savitz, III, of Columbia; for Appellant.

Attorney General Henry Dargan McMaster; Chief Deputy Attorney General John W. McIntosh; Assistant Deputy Attorney General Donald J. Zelenka; Assistant Attorney General Melody J. Brown; Assistant Deputy Attorney General Edward G. McDonnel, of Columbia; Robert M. Ariail, of Greenville; for Respondent.

HUFF, J:

Uuno Mattias "Matt" Baum was convicted of the murder of his stepfather, Randall Pinion, and sentenced to life imprisonment. Baum appeals his conviction contending that his prosecution was barred by the Double Jeopardy Clause of the United States and South Carolina Constitutions. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

On October 26, 1999, Randall Pinion went to his bank and filled out an affidavit of forgery concerning two checks in the amount of $450.00 apiece and made out to Matt Baum. The bank employee who assisted Pinion gave him the original affidavit of forgery and instructed him to take it to the police if he desired to prosecute. On October 27, 1999, two days prior to Pinion's disappearance, he arrived at work upset and told a co-worker that Matt Baum, Pinion's stepson, had stolen some money from him. Pinion told the co-worker he would

give Baum two days to repay the money or he was going to turn Baum in to the police. On the morning of his disappearance, Pinion stated to the co-worker that he was giving Baum until that evening to give him his money. Pinion never filed a police report in regard to the alleged forgeries. Two weeks earlier, Baum threatened to kill Pinion after Pinion had physically abused Baum's mother.

On Friday, October 29, 1999, Pinion disappeared after leaving work. His black pickup truck was not at his home on Friday night or Saturday morning, but appeared at his house between 3:00 and 11:00 p.m. on Saturday, October 30. Between 4:00 and 7:00 p.m. on Sunday October 31, the truck again disappeared from the house. Pinion's truck was subsequently found in a church parking lot a few days later.

On November 1, 1999, Baum sold a set of Taylor Made golf clubs to a sporting goods store, explaining they belonged to his stepfather, who had passed away and left him the clubs. Pinion owned several sets of golf clubs, including a Taylor Made set.

Police investigated Pinion's home and pickup truck and found Pinion's blood in various places throughout his home, as well as in the bed of his pickup truck. The police also found a bloody shoe print inside Pinion's home. The police concluded that Pinion had been beaten to death inside of his home and someone thereafter attempted to clean up the crime scene.

Based on their investigation, the authorities developed Baum as a suspect in Pinion's disappearance. On November 7, 1999, after receiving a tip on his possible location, police attempted to apprehend Baum as he fled in a white pickup truck. The chase reached speeds of more than 100 miles per hour, and ended when the white truck became disabled following a traffic accident. When the police searched the disabled truck they discovered the keys to Pinion's truck, a couple of Pinion's checks, Baum's driver's license, and a pair of tennis shoes whose tread was consistent with the bloody shoe print found inside Pinion's home.

On November 11, 1999, the grand jury returned a true bill against Baum for Pinion's murder, even though the police had not found Pinion's body. Baum's trial began on October 9, 2000, and the jury was sworn on that day. After Court

recessed for the evening, the Easley Police Department was notified of the discovery of an unidentified, decomposed body found on October 7, 2000 in McDowell County, North Carolina. The following day, the solicitor informed defense counsel and the court that the State had evidence it was, in fact, the body of Randall Pinion. The State moved for a mistrial or a continuance based upon the discovery of Pinion's body. Baum's counsel did not agree with the State and asserted they were ready to proceed to trial.

The circuit court granted the State's motion for a mistrial finding it was imperative the jury charged with deciding the case be given all relevant evidence upon which to base its decision. The court concluded there was a possibility that exculpatory evidence would be revealed and that the discovery of Pinion's body constituted manifest necessity to grant a mistrial. Baum's second trial began on January 22, 2001, at which time Baum objected to the new trial and moved the State be barred from proceeding to trial on the ground that it violated the Double Jeopardy Clause. The circuit court denied Baum's motion and Baum was subsequently convicted for Pinion's murder. This appeal followed.

## LAW/ANALYSIS

Baum argues the circuit court erred when it allowed the second trial to proceed because the discovery of Pinion's body did not constitute manifest necessity to justify a mistrial, and therefore, the second trial was barred by the Double Jeopardy Clause. We disagree.

The Double Jeopardy Clauses of the United States and South Carolina Constitutions prevent all citizens from being placed twice in jeopardy of life and liberty. *See* U.S. Const. amend. V ("No person shall be ... subject for the same offence to be twice put in jeopardy of life or limb ..."); S.C. Const. art. I, § 12 ("No person shall be subject for the same offense to be twice put in jeopardy of life or liberty ..."). The Fifth Amendment of the United States Constitution is made applicable to the states through the Fourteenth Amendment due process clause. *See Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) ("[T]he double jeopardy prohibition of the Fifth Amendment represents a

fundamental ideal in our constitutional heritage, and . . . should apply to the States through the Fourteenth Amendment"). Pursuant to the Double Jeopardy Clause, a defendant is protected from (1) prosecution for the same offense after acquittal, (2) prosecution for the same offense after conviction, and (3) multiple prosecution for the same offense after an improvidently granted mistrial. *State v. Kirby,* 269 S.C. 25, 27–28, 236 S.E.2d 33, 34 (1977).

 Generally, jeopardy attaches when the jury is sworn and impaneled, unless the defendant consents to the jury's discharge before it reaches a verdict or legal necessity mandates the jury's discharge. *State v. Rowlands,* 343 S.C. 454, 457, 539 S.E.2d 717, 718 (Ct.App.2000).

> Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused. Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.

*Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The test to determine whether sound grounds exist for declaring a mistrial after the jury is sworn is "whether the mistrial was dictated by manifest necessity or the ends of public justice, the latter being defined as the public's interest in a fair trial designated to end in just judgment." *State v. Prince,* 279 S.C. 30, 33, 301 S.E.2d 471, 472 (1983).

 "Manifest necessity" is not a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Further, the word "necessity" is not to be interpreted literally. *Arizona,* 434 U.S. at 505–06, 98 S.Ct. 824. Rather, there need only be a "high degree" of necessity in order to conclude that a mistrial is appropriate under the circumstances. *Id.* at 506, 98 S.Ct. 824.

Whether a mistrial is mandated by manifest necessity is a fact specific inquiry. *Rowlands*, 343 S.C. at 457, 539 S.E.2d at 719. Given the "varying and often unique situations arising during the course of a criminal trial," the United States Supreme Court has recognized a broad discretion reserved to a trial judge in declaring a mistrial. *Kirby*, 269 S.C. at 29, 236 S.E.2d at 35 (quoting *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973)). A trial judge's decision to grant a mistrial will not be overturned absent an abuse of discretion amounting to an error of law. *Rowlands*, 343 S.C. at 458, 539 S.E.2d at 719.

 Baum asserts, however, that the State sought a mistrial to simply marshal evidence to strengthen its case against him, and that the grant of a mistrial on such basis is clearly prohibited by the Double Jeopardy Clause. We agree that, as it has evolved in this country, the prohibition against double jeopardy is intended to condemn the practice of the prosecution requesting a mistrial for the sole purpose of buttressing weakness in its evidence, and the strictest of scrutiny is appropriate when the basis for a mistrial is the unavailability of critical prosecution evidence. *Arizona*, 434 U.S. at 507–08, 98 S.Ct. 824. However, we do not believe the facts of this case warrant the conclusion that this was the reason behind the granting of the mistrial.

First, we cannot say the body of the victim in this case was **critical** evidence in the prosecution of Baum such that its unavailability triggers the strict scrutiny announced in *Arizona*. As noted by Baum, the fact that Randall Pinion had been murdered was not in issue. At any rate, we conclude the discovery of the body of a victim during a murder trial, is an extremely important piece of evidence which has just as much potential to exonerate as to inculpate an accused. The judge recognized as much, and found that the public's interest in a fair adjudication was implicated by the possibility of discovering exculpatory evidence and giving the jury the benefit of the fully developed facts when deciding the matter. Consequently, we believe manifest necessity was clearly established, and find no abuse of discretion in the trial judge's determination that a mistrial was dictated by such.

216

For the foregoing reasons, Baum's conviction is **AFFIRMED.**

CONNOR and ANDERSON, JJ., concur.